# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
#### 1:05mj241

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| STEWART HUNNICUTT, JR. | ) | |
| _____ | ) | |

**THIS MATTER** is before the court in accordance with 28, United States Code, Section 636(c), and upon the written consent by defendant and the United States to disposition of this misdemeanor matter by a United States Magistrate Judge.

Defendant herein contends that the actual *stop* or *seizure* of his vehicle at a checkpoint set up by an officer of the North Carolina Wildlife Commission was violative of the fourth amendment, thereby indelibly tainting as fruit of the poisonous tree any evidence thereafter discovered. If the court were to find that the stop of the vehicle was unlawful, the exclusionary rule would mandate suppression of all evidence seized as a proximate result of such stop. Defendant has conceded that if the stop was lawful, the subsequent search of his person was also lawful.

A hearing was conducted on defendant's motion on January 10, 2006, in Asheville. The court was neither favored with memoranda of law in support of nor in opposition to such motion. At such hearing, Ranger Wade Keener, United States Forest Service, testified that he and Officer Kelly Pittman, North Carolina Wildlife Resources Commission, were conducting a checkpoint on State Road 1518 and Forest Development Road 464 for the

purpose of checking hunting licenses and general wildlife violations. Apparently, such intersection was within the bounds of lands designated by the North Carolina Wildlife Resources Commission as gamelands. While the name of the gamelands was not specified, the court takes judicial notice that the gamelands encompassing Avery County are called the "Pisgah Gamelands," which encompass some half million acres in Western North Carolina. Such checkpoint was conducted on September 15, 2005, a Sunday. The court takes further judicial notice that no hunting is allowed in North Carolina on Sunday.

Ranger Keener testified that while Pittman would be checking for valid hunting licenses and violations, he would be checking for motor vehicle violations and other criminal violations. Ranger Keener further testified that such road was a secondary gravel road that allowed travel in only one direction or lane due to recent landslides. From such testimony, the court concludes that the checkpoint would only stop vehicles headed in one direction, missing either those people who entered into gamelands or those traveling out. Ranger Keener testified that but for such checkpoint being operated by the Wildlife Resources Commission, he would not have been able to participate in the checkpoint inasmuch as the United States Forest Service requires a written plan, approval by supervisors, signage warning the public of the upcoming checkpoint and its purpose, and other formalities. Keener admitted that he did not attempt to comply with his agency's requirements or policies regarding checkpoints, but was relying on Officer Pittman's compliance with his own agency's requirements. Ranger Keener testified that he was unaware of who had approved

the plan on this day. As to the stop of defendant's vehicle, Keener testified that he and not Pittman stopped the defendant's vehicle, which was the first vehicle to approach the checkpoint that day. As a result of such stop, Ranger Keener discovered eight grams of methamphetamine on the person of defendant.

Officer Pittman also was called by the United States. He testified that he had set up the checkpoint at the direction of his superiors and that Wildlife Resources Commission Sergeant Mike Hatley, in another county, was aware of the checkpoint. Officer Pittman testified that he had no written plan, but that it was the policy of his agency to stop either every ninth car or every car during a checkpoint. On this day, Officer Pittman testified, they were going to stop every car. He further testified that he was not sure that such checkpoint was in full compliance with the Wildlife Resources Commission's policies or whether he was required to post signs informing the public of the purpose of the checkpoint. He further testified that he was in an unmarked vehicle and that the only vehicle with law enforcement markings was that of Ranger Keener. Officer Pittman did not bring the written policy of the Wildlife Commission with him to court, and could not remember what the written policy required.

While the testimony from the stand and arguments from the United States centered on the lawfulness of such checkpoint based on Wildlife Resources Regulations, statutes, or policies, no party has either provided this court with a copy of any such regulation or provided the court with a citation so that the court could find such policy. An exhaustive

3

search of Westlaw has uncovered no reported case where either a federal or state court sitting in North Carolina has discussed the lawfulness of hunting checkpoints on public roads running through "gamelands." Absent provision to the court of such case law or citation to a legislative act allowing such checkpoints, the court must consider this particular stop in the context of the jurisprudence that has developed around the fourth amendment of the United States Constitution.

In considering the reasonableness of a checkpoint, courts typically consider factors such as:

(1)     the neutral criterion implicit in a systematic procedure; Hall v. Commonwealth, 12 Va.App. 972 (1991)
(2)     warning signs or flares; State v. Riley, 377 N.W.2d 242 (Iowa Ct.App.1985)
(3)     the safety of the location; Commonwealth v. McGeoghegan, 389 Mass.137 (1983)
(4)     the productivity of the roadblock; State v. Koppel, 127 N.H.286, 499 A.2d 977 (1985)
(5)     standardized procedures for the operation of the roadblock; State v. Larson, 485 N.W.2d 571 (Minn.Ct.App.1992) and
(6)     whether the roadblock was a pretext to uncover evidence of more serious criminal activity. United States v. Morales-Zamora, 974 F.2d 149 (10th Cir.1992).

In Michigan Department of State Police v. Sitz, 496 U.S. 444 (1990), the United States Supreme Court, faced with a similar issue, determined that a reviewing court must balance: (1) the importance of the public concerns served by the checkpoint; (2) the effectiveness of the checkpoint in advancing the public interest; and (3) the extent of the intrusion of the checkpoint on law-abiding motorists.

Perhaps more to the point is the Supreme Court's more recent decision in City of

Indianapolis v. Edmond, 531 U.S. 32 (2000), wherein the Court held, as follows:

> We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing. Rather, our checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion. We suggested in Prouse that we would not credit the "general interest in crime control" as justification for a regime of suspicionless stops. Consistent with this suggestion, each of the checkpoint programs that we have approved was designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety. Because the primary purpose of the Indianapolis narcotics checkpoint program is to uncover evidence of ordinary criminal wrongdoing, the program contravenes the Fourth Amendment.

Id., at 41-42 (citation omitted). From the testimony elicited at the hearing, it is apparent that the September 15, 2005, checkpoint was not for "policing the border or the necessity of ensuring roadway safety." Id.

While this court recognizes the difficulties in enforcing game laws and the importance of preserving wildlife for future generations, it would appear that the articulable and stated purpose for the checkpoint in this case was to "uncover evidence of ordinary criminal wrongdoing." Id. As such, it violates the fourth amendment of the United States Constitution.

This is not to say that all checkpoints for compliance with game laws violate the fourth amendment. In State v. Tourtillott, 289 Or. 845 (1980), cert. denied, 451 U.S. 972 (1981), the Supreme Court of Oregon held that a wild game checkpoint stop of the defendant was not unreasonable, in that the governmental interest in enforcement of laws for preservation of wildlife was sufficiently substantial to justify the minimal intrusion upon the

rights of those stopped for brief questioning and a visual inspection of their vehicles. The

Court discussed the importance of game laws and the need for checkpoints:

> Hunting and fishing law enforcement is a part of law enforcement. Some law enforcement activities are similar to those involved in apprehending criminals; some may be similar to those of an OSHA inspector or Health Department inspector. Since hunting and fishing in Oregon are usually conducted in rural areas, accessible primarily by automobile, the role of the Oregon State Policeman assigned to the Game Division is similar to that of the Border Patrol officer, whether the officer is on foot patrolling the fish and game areas, in a car, or at a checkpoint.

Id., at 866. In finding the game checkpoint in Tourtillott to comply with the fourth

amendment, the Oregon Court found, however, that "the game warden was conducting the

checkpoint . . . in accordance with established department policy," id., at 866, "the checkpoint

was clearly marked, its purpose was plainly evident, and the game warden testified that all

approaching vehicles were stopped or slowed. The defendant was stopped pursuant to a

practice embodying neutral criteria." Id., at 867.

Applying the same factors as the Tourtillott court did, and as provided in Sitz, supra,

the checkpoint in this case lacks the indicia of neutral criteria that were found to exist in

Tourtillott. Here, Officer Pittman testified that there was no written plan; there were no

warning signs, flares, or other indicia indicating the purpose of the stop to motorists; the

Wildlife Resources Commission vehicle was unmarked; there was no supervisor on the

scene; Officer Pittman testified that he did not know whether he was required to have a plan;

and the checkpoint was set up on what was a seldom traveled road. To the extent this was

a hunting license checkpoint, it occurred on Sunday, a day when hunting was not allowed

with or without a license. Further, to the extent that this was intended to be a game violation checkpoint, and inasmuch as Ranger Keener testified that the road was "one way," the checkpoint was not designed to apprehend game violators coming in and going out of gamelands.

At the hearing, much of the testimony and arguments were devoted to whether the Wildlife Resources Commission requires its officers to have a written plan in place, like the United States Forest Service. This is a *non-sequitur*, because while compliance with agency policy may weigh in favor of the stop, the fourth amendment inquiry does not turn on whether an agency required a plan. As discussed above and in Tourtillott, a written plan approved by a supervisor would have been placed in the balance in favor of the checkpoint, in that it would have set limits on the discretion exercisable by officers in the field.

Although no evidence was presented to this court to such effect, it is quite possible that the Wildlife Resources Commission might have regulations in place which allow it to set up checkpoints on roads in gamelands. Such regulations could, if tendered, been considered and put into the tests established by the Supreme Court for balancing the fourth amendment rights of citizens with the legitimate needs of law enforcement. The only evidence presented was that Officer Pittman did not bring with him his agency regulations concerning checkpoints, and the government has not provided this court with any reference to such regulations. Chapter 113-136(g) of the North Carolina General Statutes does allow wildlife officers to stop vehicles based on "reasonable grounds" on state secondary roads;

however, a "reasonable grounds" stop is the statutory equivalent of the judicially approved "reasonable articulable suspicion." Such a suspicion is greater than that required by a checkpoint, which requires no suspicion.

With the evidence closed at the conclusion of the hearing, the only evidence which may be put into the equation is that which was presented. It appears to the court that the purpose of the checkpoint on a public road was for wildlife violations, that wildlife violations are general crimes not related to road safety, that there was no plan in place and no supervisor on scene, that there were no signs advising the public what the checkpoint was for, the Wildlife officer's vehicle was unmarked, that the road was seldom traveled, that the road on that day was one lane, and that the check occurred on a day on which the possession of a hunting license was irrelevant. It appears, however, that such checkpoint was planned was no conscious intent to violate the fourth amendment.

The court has found such defect despite strong reservations brought about by the seriousness of the offense, the amount of methamphetamine found, the devastating impact such drug has on families, and the presence of a child in defendant's truck. While the court has found that the stop in this case cannot withstand constitutional scrutiny, defendant should be aware that such a finding has no bearing on his conduct, but is instead made based on the greater societal good in protecting all citizens' fourth amendment rights. Both the government and the defendant should be aware that possession of methamphetamine is a felony under North Carolina state law regardless of amount. The court has included this

advice to this defendant based on seeing defendant during the hearing and drawing from that a belief that this particular defendant could change the direction of his life.

Finding that the primary purpose of such checkpoint was not "policing the border" or for "the necessity of ensuring roadway safety," and that sufficient indicia of neutral criteria was missing based on a totality of the evidence presented to the court in the hearing, the Motion to Suppress will be allowed on the evidence now before the court.

**ORDER**

**IT IS, THEREFORE, ORDERED** that defendant's Motion to Suppress is **GRANTED**, and all evidence seized subsequent to such stop is deemed to be inadmissible in the trial of this matter.

**Signed: January 13, 2006**

Dennis L. Howell
United States Magistrate Judge